NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

15-P-729 Appeals Court

DANIEL McLAUGHLIN & another[1] vs. AMERICAN STATES INSURANCE COMPANY.

No. 15-P-729.

Middlesex. May 19, 2016. - August 12, 2016.

Present: Kafker, C.J., Cohen, & Green, JJ.

Consumer Protection Act, Insurance, Offer of settlement, Unfair act or practice, Attorney's fees, Damages. Insurance, Settlement of claim, Unfair act or practice. Damages, Attorney's fees. Practice, Civil, Attorney's fees.

Civil action commenced in the Superior Court Department on February 21, 2008.

The case was heard by Paul D. Wilson, J.

John F. Brosnan (James E. Harvey, Jr. with him) for the defendant.
Matthew N. Kane for the plaintiffs.

GREEN, J. After the well installed by Shaun Harrington began pumping salt water through the plaintiffs' (McLaughlins) irrigation system, causing extensive damage to their

[1] Rachel McLaughlin.

landscaping, the McLaughlins sought recovery from Harrington and his insurer, the defendant, American States Insurance Company (ASIC). Both denied liability, and the McLaughlins eventually filed an action against Harrington and two others.[2] After the McLaughlins obtained a judgment in their favor against Harrington, they commenced this action against ASIC, claiming unfair insurance settlement practices. A judge of the Superior Court entered judgment against ASIC, and awarded the McLaughlins damages based on the legal expenses they incurred in prosecuting their suit against Harrington, but declined to award multiple damages as permitted by the statute. See G. L. c. 93A, § 9(3). On the parties' cross appeals, we conclude that the judge correctly determined that ASIC failed to conduct a reasonable investigation of the McLaughlins' claim, and that it failed to make a reasonable offer of settlement after liability of its insured became reasonably clear. We also discern no error of law or abuse of discretion by the judge in his refusal to award the McLaughlins multiple damages. However, we conclude that the judge erred in his failure to award the McLaughlins damages based on the loss of use of the funds ASIC should have offered

---

[2] Assurance Construction, Inc. (Assurance), the general contractor for the construction of the home to which the landscaping related, and Waterworks Irrigation, Inc. (Waterworks), the subcontractor for the irrigation system. Harrington was subcontracted by Waterworks to drill a well to furnish water to the irrigation system.

in settlement once Harrington's liability became reasonably clear.

Background. We summarize the written findings of fact entered by the judge in his detailed and thorough memoranda of decision.[3]

In 2003, Assurance was nearing completion of construction of a home for the McLaughlins in Osterville. The home is on a peninsula, surrounded on three sides by salt water bodies connected to Nantucket Sound. The project included a substantial landscaping installation. Incident to the landscaping, Assurance subcontracted Waterworks to install a multizone irrigation system, to be served by a well.[4] Waterworks, in turn, subcontracted Harrington to drill the well.

Harrington drilled the well in April, 2003, in the only location on site that his drilling rig would fit, approximately 110 feet from the shoreline. Though local ordinances required him to obtain a municipal permit before drilling a well, Harrington did not apply for a permit. In addition, though State regulations required him to submit a well completion report to the Department of Environmental Management immediately

---

[3] The judge's memorandum of decision on liability is eighty-one pages. His memorandum on damages is forty pages.

[4] Water for the home itself was supplied by means of a connection to the Barnstable municipal water system.

upon drilling the well, Harrington did not do so until after the dispute underlying this lawsuit arose.

After drilling the well, Harrington tested the water it produced by tasting it. Satisfied that it tasted fresh, and that the well produced water at a rate more than adequate to meet the requirements of the irrigation system, Harrington considered his work complete and left the site.[5]

From his experience, Harrington was aware that wells on Cape Cod drilled close to sea water might turn from fresh to salt water, by means of a phenomenon known as "upconing."[6] In such circumstances, as fresh water is pumped out of the well, salt water is drawn in to replace it. Eventually, the supply of fresh water is exhausted or largely infiltrated by salt water, and the well thereafter produces salt water. Though Harrington was concerned about the possibility that upconing could eventually occur in the McLaughlins' well, he did not advise Waterworks or the McLaughlins of the possibility. Prudent

---

[5] While Harrington was still on site, a friend of his named Andrew Miller coincidentally stopped by to see him. Miller, a hydrogeologist from Florida who was visiting family on Cape Cod, tested the water with a portable conductivity meter, a portable pH meter, and iron test strips. Though Miller did not record the test results, he concluded that the water was fresh, with neutral pH and acceptable iron levels.

[6] A well Harrington previously drilled in a seaside location not far from the McLaughlins' property had turned to salt water after initially producing fresh water.

practice of well drillers on Cape Cod in 2003, in circumstances of wells drilled near salt water bodies, was to test the water produced by the well at regular intervals after drilling, but Harrington did not do so and did not advise Waterworks or the McLaughlins that they should.

Decorative and ornamental landscaping plantings were installed in May and June, 2003, at a cost of approximately $185,000. In July and August, 2003, the plantings began to show signs of distress. In late August, after trying unsuccessfully to reverse the damage by adjusting the watering schedule, the McLaughlins discovered that the damage was caused by salt water produced by the well and pumped through the irrigation system.

Upon identifying the cause of the damage, the McLaughlins asked Assurance to submit a claim to Harrington's insurer for the damage caused by salt water produced from the well Harrington had drilled. Assurance submitted a claim to Harrington's insurance agent on October 22, 2003, and the claim reached ASIC on November 3, 2003. As submitted by Assurance, the claim included an invoice for plants killed by salt water as of that time, in a total amount of $28,224.62. The claim form submitted to ASIC by Harrington's agent indicated that Harrington did not believe he was at fault.

ASIC assigned Debra Dresner as claims adjuster to handle the McLaughlins' claim. Dresner wrote to Rachel McLaughlin at

the address of her primary residence in Connecticut on November 4, 2003, asking her to contact Dresner as soon as possible. When Dresner received no response, she sent a second letter on November 11, 2003, again asking Rachel McLaughlin to contact her. On November 5, 2003, Dresner telephoned the nursery whose invoice accompanied the claim, requesting a "legible copy" of the invoice. The nursery responded promptly, and the requested copy arrived on November 10.

On November 5, 2003, Dresner also called Harrington and took a recorded statement from him. In his statement, Harrington described the transition of the well from fresh to salt water as an "act of God." Harrington also advised Dresner that a certified hydrogeologist had done a conductivity test when Harrington installed the well. See note 5, supra. When Dresner asked if the hydrogeologist had prepared a report of the test, Harrington said that he believed so and would find out. Dresner wrote to Harrington later that day, requesting all paperwork he had relating to the loss and specifically requesting a copy of the report prepared by the hydrogeologist.

At the time she received the claim, Dresner had authority to settle claims up to $10,000 and was required to inform her supervisor of any claim for a larger amount. Though the McLaughlins' claim was for more than $28,000, Dresner did not inform her supervisor of it.

Dresner thereafter took no further investigative or other action on the McLaughlins' claim until January 26, 2004, when the McLaughlins' insurance agent left a voice mail message inquiring about the claim status. Dresner called the agent back that day; during their conversation, the agent gave Dresner the McLaughlins' telephone number. Dresner called and spoke to Rachel McLaughlin, who expressed concern over the length of time the claim process was taking and attempted to correct various factual assertions Harrington had made to Dresner. On January 26, 2004, after the telephone call, Dresner documented the call, sent a confirmation letter to Rachel McLaughlin, and sent a letter to Harrington requesting documents, including a document from the hydrogeologist, and contact information for Waterworks. ASIC took no further action until the McLaughlins' agent called ASIC on February 19, 2004.

On that occasion, Dresner was out of the office and another claims adjuster, Julio Maisonette, handled the call. Maisonette adopted an aggressive and hostile approach toward the McLaughlins' agent, to the extent that the agent asked to speak to his supervisor (a request Maisonette refused). Rachel McLaughlin called Maisonette the following day. During that call, Maisonette stated that, in his view, Harrington was not liable for the damage because the well was pumping fresh water when Harrington completed his work and Harrington had no reason

to believe it would eventually begin pumping salt water. Maisonette expressed his view that ASIC would not be liable if the well pumped fresh water even for only one day; Rachel McLaughlin responded with her disagreement with that position. Maisonette also suggested that other causes might have led to the damage to the plantings, including an unusually harsh winter, and observed that he did not even have evidence that the plantings were dead. When Rachel McLaughlin replied that she had lost approximately $72,000 in plants, Maisonette responded that he had only one invoice, for $28,000, and invited Rachel McLaughlin to send additional documentation of her losses. In response to Rachel McLaughlin's request for an explanation of ASIC's failure to send a field claims adjuster to the site, Maisonette said that ASIC had no intention of doing so. Rachel McLaughlin threatened to hire an attorney to press her claim.

Despite her frustration with her conversation with Maisonette, Rachel McLaughlin promptly followed up by sending to him another copy of the earlier $28,000 invoice, along with a second invoice for additional damaged plantings in the amount of $37,475.24. In addition, she included thirty-two photographs, depicting "before and after" conditions, together with a two-page letter explaining what each photograph depicted.

Two weeks later, on March 5, 2004, the McLaughlins' agent called Dresner to express frustration again with the manner in

which the McLaughlins' claim was being handled. Following that call, Dresner called Harrington to ask about the hydrogeologist report he had promised, and Harrington advised her that he was still waiting for it. Dresner also gave her supervisor, Ralph Tedesco, a "heads up" that Rachel McLaughlin was unhappy with the handling of her claim in Dresner's absence. Tedesco reviewed the file and criticized Dresner for not bringing the claim to his attention earlier, since it exceeded her settlement authority. Tedesco suggested several lines of investigation for Dresner to pursue, including whether there is a way to prevent salt water infiltration of a well in close proximity to the sea, and whether Harrington had warned Waterworks or the McLaughlins about the risk of salt water infiltration. As a more experienced adjuster, Tedesco expressed his opinion that liability of ASIC's insured, Harrington, was likely, and expressed his skepticism about Harrington's insistence that the damage was an act of God, since "God didn't install the well."

The following day, Tedesco convened a discussion of the claim with Dresner and Maisonette. Tedesco suggested that Dresner might retain an expert to assist in analyzing liability and that she consult with a Massachusetts attorney to see if the attorney agreed that an expert is necessary. Tedesco also suggested that Dresner contact another Cape Cod well driller to

ask pointed questions regarding the well and guarantees that could or should not be made.

Dresner thereafter consulted with Robert Feeney, a Massachusetts attorney, as suggested by Tedesco. Feeney explained to Dresner that whether Harrington's work met the requisite standard of care was a matter for expert testimony. However, Feeney also offered his lay view that Harrington had met the standard, based on Harrington's explanation contained in the claims file Feeney had reviewed.

On March 16, 2004, Miller (the hydrogeologist) prepared a letter summarizing his recollection of the tests he had performed on his chance visit to the property in April of 2003. His letter included a closing paragraph in which he described the possibility that over-pumping or continuous use of a well in close proximity to salt water risked contamination of the well due to upconing.

In early April, 2004, Dresner left ASIC on a medical leave, and Tedesco transferred the claim to another adjuster, Sharon Fox. At Tedesco's prompting, Fox arranged for an independent claims adjuster to visit the property to conduct an assessment of the damage. On May 18, 2004,[7] the independent adjuster

---

[7] The judge described the report as having been sent on May 16, 2004, but the report appearing in the record at the reference cited by the judge in his memorandum of decision is dated May 18, 2004.

submitted a report documenting damage to plants and his consultation with an experienced local nurseryman who confirmed that the damage had been caused by salt water produced by the well. The adjuster's report advised that the local nurseryman offered to furnish an estimate of the cost of the damaged plants for a fee of $500, which he would waive if the McLaughlins purchased replacement plants from him. However, ASIC never responded to the independent adjuster's request for authorization to have the nurseryman furnish a cost estimate.

Fox left ASIC in early May, 2004, and the file was reassigned to another adjuster, Suzanne Greer, who was based in Illinois. At around the same time, Tedesco also left ASIC.

ASIC's claims investigation (such as it was) continued in like manner thereafter. Greer determined in June of 2004 to deny the McLaughlins' claim, but ASIC's attorney, Feeney, did not advise the McLaughlins' attorney of the denial.

On February 1, 2006, the McLaughlins commenced an action in the Barnstable Superior Court, alleging negligence against Harrington (the well subcontractor), Waterworks (the irrigation subcontractor), and Assurance (the general contractor). Shortly before trial, Waterworks and Assurance each settled with the McLaughlins for $50,000. The case against Harrington proceeded to trial, and a jury found Harrington liable, awarding $37,500

in damages. On Harrington's motion, the trial judge agreed to offset against the jury damage award the settlement payments the McLaughlins received from Waterworks and Assurance, resulting in a net award against Harrington of zero dollars. A panel of this court affirmed the judgment in a memorandum and order issued pursuant to our rule 1:28. See McLaughlin v. Harrington, 76 Mass. App. Ct. 1124 (2010).

On June 8, 2007, the McLaughlins (through their attorney) sent a demand letter under G. L. cc. 93A and 176D to ASIC.[8] The McLaughlins then commenced the present action against ASIC, claiming unfair insurance settlement practices in violation of G. L. cc. 93A and 176D. The trial judge bifurcated the issues of liability and damages. After an eleven day jury-waived trial, the judge concluded that ASIC had failed to conduct a prompt, thorough, and objective investigation. The judge also found that Harrington's liability had become reasonably clear by at least May, 2004,[9] but that ASIC failed to make a reasonable

[8] The McLaughlins had sent two previous letters to ASIC, but the judge found that neither qualified as a proper demand letter.

[9] In his memorandum of decision, the judge based this conclusion on the report prepared and sent to ASIC on May 18, 2004, by an independent adjuster, describing his consultation with a local nurseryman who confirmed that the damage had been caused by salt water produced by the well.

offer of settlement for several years thereafter.[10] Following a six day jury-waived trial on damages, the judge found that the McLaughlins were entitled to recover their reasonable attorney's fees and expenses incurred in the prosecution of their claim against Harrington. The judge declined to award multiple damages, based on the violation of G. L. c. 93A. The judge also declined to award damages based on the McLaughlins' loss of use of funds from the date liability became reasonably clear. Both parties filed cross appeals.

Discussion. 1. Whether liability and damages were reasonably clear. Taken together, G. L. c. 93A, § 2(a), and G. L. c. 176D, § 3(9)(f), "require an insurer . . . 'promptly to put a fair and reasonable offer on the table when liability and damages become clear, either within the thirty-day period set forth in G. L. c. 93A, § 9(3), or as soon thereafter as liability and damages make themselves apparent.'" Bobick v. United States Fid. & Guar. Co., 439 Mass. 652, 659 (2003), quoting from Hopkins v. Liberty Mut. Ins. Co., 434 Mass. 556, 566 (2001). The test whether an insured's liability is "reasonably clear" is objective. O'Leary-Alison v. Metropolitan

[10] The judge found that Feeney communicated a settlement offer of $50,000 at approximately 4:31 P.M. on June 6, 2008 (the Friday before the Monday on which the trial began), during unsuccessful efforts to mediate the case. Feeney made a second settlement offer, in the amount of $10,000, on the day that the case was submitted to the jury.

Property & Cas. Ins. Co., 52 Mass. App. Ct. 214, 217 (2001). "The fact finder determines 'whether a reasonable person, with knowledge of the relevant facts and law, would probably have concluded, for good reason, that the insure[d] was liable to the plaintiff.'" Ibid., quoting from Demeo v. State Farm Mut. Auto. Ins. Co., 38 Mass. App. Ct. 955, 956-957 (1995).

The judge's conclusion that Harrington's liability was reasonably clear as of May, 2004, is supported by his findings of fact (which, in turn, find support in the evidence and accordingly are not clearly erroneous). In particular, by letter dated May 18, 2004, ASIC's independent adjuster had submitted to ASIC his report which confirmed that the McLaughlins' plantings had been killed or damaged by salt water pumped through the irrigation system supplied by the well Harrington had drilled. The extent of the damage was substantiated by invoices supplied by the McLaughlins totaling more than $66,000.[11] ASIC was also in possession of Miller's letter, advising of the risk of salt water intrusion into wells drilled in close proximity to the sea, if the well were used

[11] Additional invoices later supplied, as additional damage developed, increased the total to an amount of approximately $164,000. The force of ASIC's protest that the amount of damage was inflated by reason of its source from an out-of-State supplier is weakened considerably by ASIC's failure to pursue the offer of a local nurseryman to furnish an independent estimate.

continuously or over-pumped. ASIC had previously been advised by Harrington that the McLaughlins' irrigation system was a multizone system that would water plantings on a large site, and therefore would be used heavily. Moreover, ASIC knew that Harrington was aware from his own experience of the possibility that salt water could infiltrate the well, yet failed to advise Waterworks or the McLaughlins of the possibility of such contamination, or of the need to monitor water quality as water was pumped from the well over time.[12] As the trial judge observed, based on this information "[a] reasonable objective insurer would have concluded by May 2004 that Harrington was liable to McLaughlin, at the very least for failure to warn."

On appeal, ASIC raises two principal claims of error underlying the trial judge's conclusion. First, it contends that Harrington's liability was never established, much less reasonably clear, because the judgment ultimately entered against him was for no monetary damages. Second, ASIC contends

---

[12] Again, ASIC's failure to consult an independent expert (the need for which Tedesco recognized and Feeney endorsed) on the standard of care, or on the likely cause of salt water contamination of the McLaughlins' well, renders its unquestioning acceptance of Harrington's denial of responsibility unreasonable. As the trial judge correctly recognized (and ASIC does not dispute on appeal), in the absence of an expert assessment of the cause of the contamination and the standard of care applicable to a well driller in a coastal area, ASIC could not reasonably rely on the lay opinion of its counsel, Feeney, that Harrington was not negligent.

that the presence of two other joint tortfeasors rendered the extent of Harrington's potential liability unclear as matter of law. Both claims are unavailing.

As a threshold matter, we observe that the jury in the underlying negligence trial concluded that Harrington was negligent, and that his negligence caused the McLaughlins to incur damages. More fundamentally, however, the question whether and when an insured's liability became reasonably clear is based on an objective assessment of the facts known or available at the time, and is independent of how a jury in a separate trial views the insured's liability. See Bolden v. O'Connor Cafe of Worcester, Inc., 50 Mass. App. Ct. 56, 66 (2000). See also Bobick, 439 Mass. at 662 ("[A] jury's verdict is not always predictable and may not constitute in all circumstances a definitive measure of reasonableness"). As we have observed, there was ample basis for the judge's conclusion that Harrington's liability for, at least, a failure to warn of the possibility of salt water contamination of the well, and the related need to monitor water quality, was reasonably clear as of May, 2004, and that ASIC was aware of substantiated damages to plants valued at approximately $66,000 as of that time.

We likewise reject ASIC's suggestion that liability of an insured can never be reasonably clear, as matter of law, so long as other potential tortfeasors are apparent. In pressing its

assertion, ASIC relies on a comment in Bobick, supra at 660, in which the court observed that, though fault of the defendant's insured may have been ascertained by a specified date, "the percentage of damages attributable to [United States Fidelity and Guaranty Company (USF&G)] and to Continental [the insurer of a potential joint tortfeasor] was still the subject of good faith disagreement. We conclude that the extent of USF&G's liability to the plaintiff cannot, as matter of law, have been clear at that time."

In our view, ASIC reads the quoted language from Bobick too broadly. First, there is no evidence in the record to suggest that the potential liability of Waterworks and Assurance was a matter of consideration by ASIC in May, 2004, much less the subject of a "good faith disagreement" among the defendants in the McLaughlins' eventual tort suit. Ibid. See Clegg v. Butler, 424 Mass. 413, 418 (1997). Furthermore, the fact that the McLaughlins ultimately named Waterworks and Assurance as defendants in their underlying complaint, or even that both ultimately agreed to pay the McLaughlins an amount in settlement of their claims, did not excuse ASIC from its statutory obligation to make an offer when Harrington's liability became reasonably clear.[13] See Bertassi v. Allstate Ins. Co., 402 Mass.

[13] We note that USF&G made a settlement offer in Bobick, supra at 660, at approximately the time the liability of its

366, 372-373 (1988) (affirming violation of G. L. c. 93A by an insurer, despite presence of, and settlement payments by, other tortfeasors). Indeed, it would significantly diminish, if not defeat, a principal purpose of G. L. cc. 176D and 93A if an insurer could refuse to make any offer of settlement whatsoever in any case in which potential tortfeasors other than its insured might share liability. See Clegg, supra at 419 (citation omitted) ("The statutes at issue were enacted to encourage the settlement of insurance claims . . . and discourage insurers from forcing claimants into unnecessary litigation to obtain relief").

2. Failure to conduct a reasonable investigation. We likewise discern no error in the trial judge's conclusion that ASIC failed to conduct a reasonable investigation of the McLaughlins' claim, as required by G. L. c. 176D, § 3(9)(d). As our summary of the judge's extensive factual findings makes plain, ASIC failed to subject Harrington's initial denial of responsibility to serious scrutiny and failed to take even the most basic steps toward obtaining an independent or neutral assessment of his potential fault. Of perhaps greatest concern was ASIC's failure to consult an expert in hydrogeology about

---

insured became reasonably clear. By contrast, the insurer in the present case made no settlement offer of any kind or in any amount until the eve of trial, years after the liability of its insured was clear. See note 10, supra.

the reason for, or foreseeability of, the infiltration of salt water into the McLaughlins' well, despite Tedesco's recognition of the need for one. Its approach to the claim overall was at best inattentive, if not incompetent.

3. Attorney's fees as damages. After concluding that ASIC was liable for a violation of G. L. cc. 93A and 176D, the trial judge concluded that the McLaughlins were entitled to recover as damages the attorney's fees and expenses they incurred in prosecution of their underlying tort suit against Harrington, Waterworks, and Assurance. On appeal, ASIC challenges both the inclusion of such costs as an element of damages and the reasonableness of the amount.[14] Again, we discern no error.

"If a c. 93A violation forces someone to incur legal fees and expenses that are not simply those incurred in vindicating that person's rights under the statute, those fees may be treated as actual damages in the same way as other losses of money or property." Siegel v. Berkshire Life Ins. Co., 64 Mass. App. Ct. 698, 703 (2005).[15] See DiMarzo v. American Mut. Ins. Co., 389 Mass. 85, 101 (1983); Columbia Chiropractic Group, Inc.

---

[14] The trial judge awarded $175,000 as actual damages, consisting of the reasonable attorney's fees and expenses in the underlying tort suit.

[15] In Siegel, the attorney's fees and expenses were incurred in defense of unfair and deceptive acts of creditors in attempting to obtain ownership of the plaintiff's life insurance policy.

v. Trust Ins. Co., 430 Mass. 60, 63 (1999). Accordingly, where an insurer's protracted delay in settling the underlying tort case requires a plaintiff to proceed to trial on that case, the plaintiff's attorney's fees and expenses incurred in that suit are properly recoverable as actual damages caused by the statutory violation. See Rivera v. Commerce Ins. Co., 84 Mass. App. Ct. 146, 149 (2013). In the present case, the McLaughlins engaged their trial counsel in the underlying tort case on an hourly rate basis.[16] The trial judge accordingly properly considered the fees incurred by the McLaughlins in prosecution of their claim against Harrington as damages incurred as a consequence of ASIC's failure to make a reasonable offer of settlement at a time when Harrington's liability had become reasonably clear.

We likewise discern no abuse of discretion in the determination by the judge of the amount of the McLaughlins' reasonable attorney's fees and expenses. See Twin Fires Inv., LLC v. Morgan Stanley Dean Witter & Co., 445 Mass. 411, 432 (2005). The judge applied the correct legal standard to his review of the McLaughlins' application for fees, both as actual

---

[16] The case in that respect is different from Miller v. Risk Mgmt. Foundation of the Harvard Med. Insts., Inc., 36 Mass. App. Ct. 411, 421 (1994), in which the plaintiffs engaged counsel in the underlying case on a contingent fee basis.

damages and in prosecution of their G. L. cc. 93A and 176D claim, and ASIC does not contend otherwise.[17]

4. Loss of use damages. In addition to attorney's fees incurred as a consequence of ASIC's failure to make a reasonable settlement offer, the McLaughlins assert in their cross appeal that they should also have been awarded an amount to compensate them for the loss of use of the funds ASIC should have offered in settlement once Harrington's liability became clear. See Clegg, 424 Mass. at 423-424; Rivera v. Commerce Ins. Co., 84 Mass. App. Ct. at 148. Reasoning that the judgment entered in the underlying tort action awarded no damages, due to the offset resulting from the settlement payments made by Waterworks and Assurance, the trial judge concluded that the McLaughlins are not entitled to loss of use damages. See Hopkins v. Liberty Mut. Ins. Co., 434 Mass. at 567 (recognizing right of plaintiff "to recover interest on the loss of use of money that should have been, but was not, offered [in settlement of insurance claim], if that sum is in fact included in the sum finally paid to the plaintiff by the insurer"). This was error. See Bertassi, 402 Mass. at 373.

---

[17] We reject ASIC's contention, raised for the first time on appeal, that the McLaughlins may not recover any fees incurred after ASIC finally made its first settlement offer, on the eve of trial. See note 10, supra. Because ASIC did not make the argument in the trial court, it is waived. See Carey v. New England Organ Bank, 446 Mass. 270, 285 (2006).

As discussed above, the presence of other joint tortfeasors did not derogate from ASIC's obligation to make a reasonable settlement offer once Harrington's liability became reasonably clear. Its failure to do so deprived the McLaughlins of the use of the funds ASIC should have offered in settlement once Harrington's liability became reasonably clear, until the McLaughlins finally received compensation for their lost plantings. To the extent Harrington's ultimate liability was reduced by offset of settlement payments made by Waterworks and Assurance, those settlement offers were not made until the eve of trial and did not obviate the McLaughlins' loss of use of the funds prior to that time. Accordingly, the McLaughlins are entitled to recover loss of use damages "from the time when the claim should have been paid to the time that a settlement or judgment was paid," Rhodes v. AIG Domestic Claims, Inc., 461 Mass. 486, 497-498 (2012), adjusted to account for the settlement payments made by Waterworks and Assurance, respectively, when they were made. See Bertassi, supra.

5. Multiple damages. The McLaughlins also contend that the trial judge erred as matter of law in declining to multiply the damages he awarded them for ASIC's violation of G. L. c. 93A. Under that chapter, actual damages shall be doubled or trebled if the violation is knowing, wilful, or in bad faith. See G. L. c. 93A, § 9(3). The requirement of a wilful violation

is satisfied if the violation is reckless. See Kattar v. Demoulas, 433 Mass. 1, 16 (2000). We review a judge's decision whether to award multiple damages on a G. L. c. 93A claim for abuse of discretion. See ibid.

The trial judge specifically found that ASIC did not act knowingly or wilfully in its failure to make a reasonable settlement offer, and he rejected the McLaughlin's request for a finding that ASIC's violation was reckless. We discern no clear error in the judge's factual finding that ASIC's violation was not knowing, wilful, or in bad faith, and no abuse of discretion in his refusal to award multiple damages.

6. Attorney's fees for this appeal. The McLaughlins have requested an award of their appellate attorney's fees incurred in this appeal. We agree that such an award is appropriate. See Yorke Mgmt. v. Castro, 406 Mass. 17, 19 (1989). In accordance with the procedure set forth in Fabre v. Walton, 441 Mass. 9, 10-11 (2004), the McLaughlins may file an application therefor with the clerk of this court within fourteen days of the date of the rescript. ASIC shall have fourteen days following the filing of the McLaughlins' application to respond.

Conclusion. So much of the judgment as declined to award loss of use damages to the McLaughlins is reversed. In all other respects the judgment is affirmed. The case is remanded

to the Superior Court for further proceedings consistent with this opinion.

So ordered.